Would you please come and introduce student council to us? Good morning, your honors. If it pleases the court, Adelson Francois, faculty director for the Georgetown Law Center Civil Rights Clinic, and I'm introducing student council, Kylie O'Donnell, who will be presenting argument for the appellant this morning. All right. We thank you very much, and we're pleased to have you here. Good morning, your honors, and may it please the court. Good morning. The district court erred as a matter of law, and its judgment should be reversed for three reasons. First, officers violated the Fourth Amendment when they entered Professor Hayat's home without a warrant, without probable cause plus exigent circumstances, and without reason to believe that their entry was direly needed to render emergency aid. Second, the district court wrongly assumed that retreat from a Terry stop is a per se exception to both the warrant and probable cause requirements. It is not. But third, even if it were, there was no Terry stop in this case. Officers never made a valid show of authority and lacked reasonable articulable suspicion. A person's home is afforded a first among equals status under the Fourth Amendment. Without a warrant, search and seizure of a home is presumptively unreasonable. But was this a search and seizure of a home, really, when the reasonable suspicion was formulated or was found outside of the home? Your honor. I mean, it's a different situation of where there's no connection between what immediately was seen outside and what the search took place within. I mean, normally you have a situation where you apply for a warrant and you do so and then you simply go in and conduct the search. But here, it's part of a sort of a continuous train of events, is it not? Your honor, there was not reasonable suspicion in this case. So, I'm happy to speak about that issue first. Let me ask you just about that. Assume with me that this was a kidnapping and these children were being abducted and taken away. Within a half hour of the report, the parents came forth and said, our kids have been stolen. And everything else is the same. Your argument is that when the defendant closed the door, the police should have just walked away and gotten a warrant. In the meantime, the kids would have been taken, hidden, removed, and this is private property. The police can't come there even though they have information that there was a kidnapping. What should the police have done under your proposition? Your honor, taking your hypothetical on its face as you described, officers in that situation may have had an objectively reasonable basis, as the emergency aid doctrine requires, to enter the home for the purposes of rendering emergency aid to children. But that hypothetical is distinct from the facts of this case. Well, my hypothetical, the only difference was that this turned out to be a real kidnapping as opposed to one that was reported by the informant. And so we can go there if you want to talk about that. But it seems to me the police are not in a position to assess all that. They questioned the reporter about the details. And the reporter explained what he saw and got the license plate number and all that and told the police. Now, the police could say, I don't believe it. And of course, at that point, we have kids that are lost. But the police have to take it. They found it credible. There's a lot of corroboration that made it credible. And I'm not sure what you want the police to do. I mean, this is a very serious crime if it were occurring. It turns out in this case, it wasn't occurring. But I'm not sure where you want us to go on this. They walk up to the front door, engage in a conversation. And, of course, that conversation is very, very awkward. I watched it several times on tape. And it seems to me if these people were, you know, Terry's stop is conducted to allay suspicion. And it seems to me when they went there to question the defendant, their suspicion wasn't allayed. It was heightened because of the refusal to answer questions, refusal to come forward, and then slamming the door in the middle of a sentence. And so I think you've got to sort of take the other side and see what does the public expect of the police when they have that kind of a report. Judge, to the point of your hypothetical, the factual distinction between the hypothetical in this case is that there was no report from parents that children were missing. No, no. This report came from a witness who saw, let's say he just saw a little bit more. He maybe missaw, but he reported he was very concerned. He was concerned enough to take the license plate down. He witnessed the kids. They were screaming. They were thrown into the trunk. He said they were tied up. And the person went away, and he tried to catch the license plate. Now, it may have been innocent, but it also may have been a serious problem. And your whole argument would have put handcuffs on the police that they just couldn't have explored that suspicion. Your Honor, we disagree with that. Officers? Let me ask you this before you start. Yes, of course. And I know we're at the summary judgment stage, but isn't there a question of fact? My understanding is that there was an anonymous tip. In that anonymous tip, no one used the word kidnapping. And they followed up on the tip. Somewhere in translation, dispatch said kidnapping. They go to the IHOP. They speak to, I think his name is Solano. And Solano says that this man is in a Tesla. He gives them the tag number, and he put the kids. And I don't know if he tied them up. I don't remember seeing tying up. Or let me say this. There's a question of fact as to whether there's some tying up or if it's a throwing. My understanding is that the testimony that we know is that the kids were placed in the back of a Tesla. And it's a trunk. And we know that the police officer says, Morano, I believe is his name, that Teslas have rear-facing seats, and that is legal. Yes, correct. Okay. So I'm not sure that the facts here are similar to what the hypothetical that Judge Nehemiah just stated. And am I correct that those are all disputed facts? Yes, you're correct, Your Honor, that those are the disputed facts in this case. And that when officers arrived, they were operating off of a tip. And what they knew was that there was a black man who was seen putting children in the back of a Tesla and that a Tesla had legal rear-facing seats. I don't quite understand your response to that question. You say it was disputed. The officers didn't dispute the report, and they didn't dispute the information they received. They explored it. They ran it down. They got it from a second-hand witness, and then they got the first-hand witness. They got the license plate number. The officer spoke Spanish to the person and said what he said, and he said he actually used the word tied up according to the officer. Now, it may not be right, but that's the information the officer had. Now, what's the officer supposed to do with that information? It's not disputed. Judge, officers should have investigated and developed an objectively reasonable basis. They could have gathered more information about what happened at the IHOP, what might have been occurring in Professor Hyatt's home. And in the meantime, the kids are gone, right? They could have. No, Judge. You're giving second question about the type of investigation the police should be conducting. But I gather you agree the police are entitled to investigate and pursue that. They now have reasonable suspicion that something's going on. They are entitled to investigate, Judge, but I would point you to Case v. Montana, which says that the emergency aid doctrine is not about criminal investigation. I'm not talking about emergency aid. I'm talking about terrorist stuff. Reasonable suspicion. Well, to the point of reasonable suspicion, I would point you to Massenburg, and I would point you to U.S. v. Black, both cases from this circuit. In Massenburg, the circuit said that an officer cannot turn normal responses into suspicious activity, and in Black, this court said that officers cannot patch together innocent suspicion-free facts that can't rationally equal suspicious activity. What officers saw when they arrived at Professor Hyatt's home was a man standing on his rights. He calmly engaged with officers. He asked them what they were there for. They said to investigate a kidnapping. He calmly responded that there was no kidnapping here. At that point, he then said, what do you intend to do? Officers said, can we see the kids? He chose not to subject his children to a late-night encounter with police, and it's his legal right not to have. He had a lot of legal rights, but the officers had a right to allay suspicion, and the man wouldn't answer questions. He wouldn't let them see the kids. He wouldn't explain. He didn't explain anything about what he did. He said simply his only response is no kidnapping here, and then he refused to answer. When his wife started to talk, he said, get inside, Noreen, whatever her name was, and he then closed the door. I don't know if the police just walked away at that point saying, we have no right to do anything further. I don't know what would have happened with those kids if those were real kidnappings. I think it would have been a dereliction of police duty, I would think. Well, Judge, if we're talking about reasonable articulable suspicion, the home is protected by more. The home is protected by probable cause plus exigent circumstances, and we know that from Payton and Kirkby, Louisiana. So even if officers had reasonable suspicion on this record, they didn't have a basis to enter the home. Defendants argue that pursuant to a Terry stop— Are you familiar with Justice Brennan's opinion in Warden v. Hayden? Could you describe that further to me, Judge? It talks about hot pursuit, and that is when you're talking about either reasonable suspicion or probable cause, and that's formulated outside of the house. And here the activity that furnished the suspicion or the probable cause, and we can debate that, was formulated outside. But this opinion and others seem to indicate a basic principle that where someone—where suspicious activity takes place right outside and then someone retreats into the home, you can imagine it extending to all kinds of situations in which someone could commit—likely to commit a perfectly heinous crime. That obviously didn't happen here, but someone could commit a perfectly heinous crime and then go and lock the door and say there's nothing you can do. And Judge Niemeyer points out that kidnapping young children— and we all know that it didn't here. This was a family situation, a perfectly natural one. But kidnapping young children is about as horrible a kind of thing as anyone could imagine. And do we want to put barriers, concrete barriers, in front of the police in investigating something where delay may mean somebody scooted off with the children? I mean, there's a way of looking at this, and that is you can be appreciative of the fact that the police cared about it. I know this was an unpleasant situation. I know this was a very, very difficult situation for everyone involved. I like to think, though, that people might be appreciative of the fact that officers were concerned about the welfare of their children. That's a good thing. Officers obviously serve such an important public function, Judge, and we do not dispute that at all. But the home is protected by a probable cause of a crime, and to say that officers could enter unless would undermine the warrant requirement. Why aren't there exigent circumstances here in this sense, that if someone's going to kidnap very young children, they want to do it quickly. And a lot of times in order to receive some ransom or whatever they want to do, they're likely to want to make a quick getaway or to do whatever they're doing quickly. And I know I can understand why the homeowner here would be very upset, but I can also understand it from the standpoint of society needing to make sure that we don't put too many barriers in the form of extensive litigation to police who are looking after the community welfare and trying to protect the public's undisputed interest in the welfare of young children. That is my problem. I don't want to introduce too many inhibitory factors in a crime such as this. And I don't underestimate. I mean, as the father of those children, I would have been upset, too. I can understand that completely. But I can also understand that society has a special obligation to look after its young. Wasn't that what happened here? Judge, I see that my time has concluded. May I briefly answer your question? You sure can. Thank you. You sure can. I have two points in response to that, Judge. The first is that under the emergency aid exception, the Supreme Court has been clear that a community caretaking exception does not exist. So that goes to the criminal investigatory context. And the question is, you know, what officers needed to enter the home in this case? And to say that they could enter on the undisputed record here would be to establish a categorical rule, essentially, that any time someone is accused of a kidnapping, which is a serious crime, that officers could enter their home. But that defies the totality of the circumstances analysis that the courts have had. Can I ask you one question? Yes, Judge. I'd like to understand your principle. And you can just answer this as a matter of law. Okay. If the officers are conducting a Terry stop in the street, they have reasonable suspicion to stop somebody, and they start asking a few questions, and before they get to the third question, the person they suspect of committing a crime runs into the house, do the officers have to walk away then and get a warrant? Is that your position? Our position, based on those facts, if reasonable suspicion did not develop into probable cause, yes. Did not develop into probable cause. They would have needed to get a warrant. And I would point you to Kirkby's case. So that every Terry stop, when somebody runs from the Terry stop and then goes into a home, they can get sanctuary from the officer who has a reasonable suspicion and has not been allowed to allay his suspicion. That's your position? Judge, yes, we know that the home is protected by probable cause. I understand that. I just want to know if that's your position, that the Terry stop cannot be continued. Yes, Judge, that is our position. And we would point you to Kirkby, Louisiana, for that proposition. And we would also point you to Lange, in which the Supreme Court said that exigency is a closed set, and it wants to extend those exceptions to the warrant requirement further. We've taken up between Judge Niemeyer and myself, and I plead guilty to that. We've taken up too much of your time. Do you have some concluding comments that you would like to make? I want to make sure that you get your argument out. Do we have time for rebuttal still, or do we think that's enough? Just for now. I'm just encouraging you to give us some concluding comments, and you've also got some time for rebuttal. But, you know, I'm a guilty party. I've taken up a good bit of your time, and I shouldn't have done that. So go ahead. Thank you, Judge. I appreciate that. Basically, Your Honors, this case comes down to what officers need to enter a home, what level of evidence. We know that the retreat into a home stands at the core of the Fourth Amendment, and that the home is afforded the utmost protections, and that is the one space that the Fourth Amendment was articulated to protect. And the Supreme Court has been very clear on what officers need for home entry. In the emergency aid context, it's necessary. They have an objectively reasonable basis to believe their entry was direly needed to render emergency aid. Based on the facts of this case, officers did not. And in the criminal investigatory context, they need probable cause plus exigent circumstances. Neither the district court nor defendants argue that there was probable cause here, and we know that exigency is a closed set, and it does not include retreat from a Terry's stop. Thank you very much. You've got some time for rebuttal. Thank you, Judge. Mr. Ramirez, we'd be pleased to hear from you, sir. Good morning, Your Honor, and may it please the Court. My name is Aaron Ramirez, and I, along with co-counsel Kristen Nunley, represent Sergeant Diaz and the other appellees. We would ask that this Court affirm the district court grants of summary judgment in favor of the appellees for three reasons. First, the district court correctly held that Sergeant Diaz lawfully initiated a Terry's stop in this case for an encounter that began outside of the appellant's residence and was based on reasonable suspicion. Second, entry by Sergeant Diaz was also permitted. Where's the reasonable suspicion? The reasonable suspicion, Your Honor, begins with the call itself. The call was for a priority. It was a priority call from dispatch indicating that there was a report for a kidnapping. But the tip, the anonymous caller didn't use the word kidnapping. That was dispatch, right? So dispatch coded it as a priority based on the information relayed. Excuse me. Dispatch coded it as a kidnapping based on the information relayed by the first anonymous caller, as you described him. We actually know that caller's name. That caller's name is Luis. And it is important to clarify, I think for the record, that there are two individuals involved where the police are getting information. The first is Luis who actually makes the phone call to 911. However, Luis did not make these firsthand observations. That was Mr. Ayala Solano. So Mr. Ayala Solano was the actual person there who witnessed this event that, as the Court has already noted, was so concerning that it actually caused him to write down the tag information. And he was still there, present, at the IHOP when Officer Moran, I think the Court alluded to him earlier, was there. But when Morano gets there, he says that he puts the kids, this whole thing about throwing kids, tying them up, Solano doesn't say that. Would you agree? No, I do not agree. And I'm glad that you've raised that point to clarify that for the record. So we have the benefit of Officer Moran's deposition testimony. And in that deposition testimony, and we also have the benefit of the actual radio transmission itself that was overheard by Sergeant Diaz en route to the residence. But to tie up the children question, that was relayed to Officer Moran by Mr. Ayala Solano on the scene. That is in his deposition. But it is disputed. What is disputed? That there was this record, other than the officer, there's this dispute as to whether or not Solano said that to the officer. No, I don't believe that is disputed because it is a deposition under oath, and the only two people that were witnesses to that conversation would be Mr. Ayala Solano, the reporter, the first party, the eyewitness reporter, and Officer Moran. And we have, as part of the record, the under oath deposition testimony of Officer Moran that says that Mr. Ayala Solano told me that the children were tied up. And that is as part of the joint account. And he also says that he told him, he says he put him in the back of the car and was yelling at them, right? He put him in the car and he was yelling at them. And then he says, Morano, not Solano, the eyewitness, says, well, a Tesla has rear-facing seats, and that is legal. So the complete transition, and just a bit, and I think there's a point of clarification in your honors recitation of the facts, the radio transmission from Officer Moran, overheard by Sergeant Diaz, is as follows. I have the original complaint in here. He says he was at the IHOP in Langley Park, and he saw the black male open the trunk, not the vehicle, the trunk, yell at the kids, and then close the trunk. But like I said, they might have possible rear-facing seats. Okay, so what part of that, because this is what's happening at the time over dispatch, right? Where do you get in there that he said that he tied them up and he told them that over dispatch? I understand what was said at the deposition. But this is an objective standard. So what he said at the deposition is after the fact. But over dispatch, he said he put him in the car, and he yelled at them, and he closed the trunk. Correct. So what part of that at the time is kidnapping? So there's two things at issue here in terms of the facts. There is what was relayed over the radio and overheard by Sergeant Diaz, but there was also the corroboration element, because I think that's one of the questions that the court had earlier, was how is this being corroborated as a kidnapping because kidnapping is the words of the dispatch interpretation, right? And so how do we know that that is correct based on what the eyewitness said? So when Officer Moran responds and actually interviews the reporter, the eyewitness, he gets all of this information. He doesn't put, I agree with you, I agree with you. This is what he says. He says, so the gentleman was speaking in Spanish, and he stated that he witnessed a gentleman come out, open up a trunk, tie up children inside, yell at them, and slammed and shut before driving off. That's what the witness told Officer Moran. Yes, I think you're reading from his deposition.  Correct. But over dispatch at the time of the incident, that is not what he said. So I agree with you that the tie up the children was not put out over dispatch, but those are two separate issues. What was put out over dispatch is the information that is available to everyone to hear, but I believe your original question is how can the police conclude, how is dispatch correctly concluding that this constitutes a kidnapping? And the answer lies in what Judge Niemeyer just said, which is Officer Moran's purpose to go and interview this first-person reporter is to actually verify, okay, are we understanding this correctly? So he gets additional information that includes the tying up of the children, although that isn't put out over the radio. I agree with you. That still corroborates the description of a kidnapping. So you don't think that it would be important for him to say, because he says it's in his deposition sometime later. You agree, right? Yes, I agree. So if there is a kidnapping and kids are tied up and thrown into the back of a car, he just left that out from telling dispatch that. So that would not be important to tell dispatch on a suspected kidnapping. Well, I can't speak to the decision-making that Officer Moran made at the time. Because this is an objective standard. He says over dispatch that there is a Tesla and that there are kids that he put in the back of the car. Correct. He's yelling at them, and he closes the trunk. And the officer offers not to witness that some Teslas have rear-facing seats. Yes, they might have rear-facing seats. I think you have stated correctly, Your Honor, I think your statement of what was put out over the radio is consistent with what you've just said. Let me ask you two quick questions. Did you interpose any kind of defense of qualified immunity here? We did. I'm not sure you knew. I know you're not giving away your argument that there was nothing incorrect about this. That is correct, Your Honor. As a matter of fact, you've interposed qualified immunity. We have. As I was noting earlier, entry to the residence was there were three grounds for affirmance in this case. The Terry stop was correct. The entry was permitted under emergency aid. And third, qualified immunity. I understand. I'm sorry. The other question I had was with respect to Judge Niemeyer's earlier question. Judge Niemeyer said, what do you expect to do? What would you expect the police to do? And if we were to reverse here, wouldn't we be come close to creating a rule that the only thing that the police can do in the face of very suspicious, in the case of suspicious circumstances, is simply to walk away? I think that's exactly what this court would impose. And is that the kind of rule that in the long run is going to protect children and all kinds of victims of crime? Just saying, when faced with this and the circumstances here that I think rise to the level of exigent because of the speed with which kidnappings and abductions occur, do we really want to communicate that the only option the officers have is to walk away, formulate an affidavit for a warrant, see if they can get a magistrate approval, and at the end of it, all the children are long gone? And is that the rule that emerges here? Your Honor, not only is that not the rule that emerges here, but in two cases heard before the circuit and affirmed before the circuit, which are both Harbin and Rivera, this court actually has affirmed situations where a Terry stop encounter begins outside of the residence. Now, you know in Rivera, they were in the parking lot of the apartment complex. This man is standing in his front door. And so you don't think that's different? He's standing in his front door. They're investigating a domestic dispute. And they tell him, do not move. That's not the case here. He's seized at the time in Rivera. So while I agree that in Rivera that command existed, I do not think it's as dispositive and certainly not part of the rulemaking as has been interpreted this court. What here tells us that they were seized at the door where they could not go back into their house? So I'm happy to clarify this. And I think this was actually already stated by the court previously where someone indicated that this was a continuous encounter, and that's exactly how we view it. So from our perspective, and I want to clarify this because I don't think there's an argument that we've conceded in the brief. We have not. I would point the court to page 14 of our brief, but I'll state it concisely here. The Terry stop was initiated the moment that the appellant cut off the conversation with his wife and turned around to walk away. And Sergeant Diaz, in response to that— So that's when he was supposed to know that he was seized. The moment that Sergeant Diaz began to follow him, taking steps to follow him to prevent his reentry, that overt act by Sergeant Diaz to follow him is the initiation of the Terry stop. So that's the initiation. So the Terry stop is not when they arrive at the house because the car is not even there in the yard. So you're saying once he enters the house that that's the Terry stop? This court can look back temporally at any point in the conversation to deem where the Terry stop began. However, it is our— But no, you're saying your position is that the Terry stop is once he entered the house. No, my position is that the Terry stop was initiated once the investigation was cut off. And at that point, Sergeant Diaz takes the affirmative step to detain by walking up behind and seizing the appellant at the door. He didn't seize him at the door. He pushed and opened the door behind him. Yes, that is correct. But all of this, as was stated earlier, is all one continuous transaction. Okay, and let me ask you, in terms of reasonable suspicion, because you make this argument that he was not cooperative, right? That's not how we phrased it, no. Okay, well, how do you phrase it? As to your reasonable suspicion, since your Terry starts at the time that he pushes his way in the door. So I think there's been—I think there's some—there is an encounter that happens outside, right? And this is a conversation. This is clearly an investigation, right? And I think—and I want to sort of take a moment to step back so that I'm not mixing standards here and mixing a phraseology. This encounter clearly begins outside. It is clearly a criminal investigation. This is articulated from the outset, right? I think what the appellants are saying has to happen is that there has to be a, quote, show of authority in order to continue into the home. That is not stated in Harbin. In fact, the facts of Harbin are completely different than that, and that is not stated in Rivera. So you're saying there does not have to be a seizure for the reasonable—because you're saying under the Terry stuff. I mean, how does he know that he is not to leave? He's not—he— Because in Rivera, they told him, you are not to leave. He took off and ran, and that's why the court said he was seized. He took off and ran. You have the right to go in the house after him. So I disagree with you that the court in Rivera said he was seized at the point of the command because the case law, I think, is very clear that a show of authority or a command that's disobeyed is not a seizure, and I think that's clear. But I will answer that question, I think, best by pointing to the facts of Harbin because in the facts of Harbin, which were later affirmed by this court and that opinion adopted by this court, the two officers that end up seizing the Harbin suspect after he has crossed the threshold of the home has no awareness whatsoever that the police are following him. I think the appellants have misread the facts of that case. In the Harbin case, there is a report of a gun at a 7-Eleven. Thirty minutes earlier, two different officers follow another man with a gun. The two officers that stop Harbin find Harbin in the street, follow behind him a distance of 15 to 20 feet, and it is only after Harbin crosses into his house do they announce themselves by commanding him to stop. So those facts would mirror our facts to the extent that Your Honor thinks that it wasn't clear before. The gun, I mean, what is your reasonable suspicion here, though? He says, he tells them, if you would like to enter my house, you have to get a warrant. So him asserting his constitutional rights is leading to reasonable suspicion? The fact that a priority kidnapping call was put out, that the eyewitness was interviewed who confirmed- Okay, so there's a kidnapping call, right? There's a kidnapping call. All right, so normally it's a kidnapping call, it's an emergent situation, right? Yes. Is there an amber alert put out for the call? To my knowledge, no. All right. They show it, but there's sirens? And that is specifically, there were specifically no sirens or lights used to not trigger- Is there a BOLO put out over dispatch from, I mean, none of these things say that there was a kidnapping. So I would disagree with you on the fact that none of these things say there was a kidnapping. And I don't know what the court means by a BOLO, but a priority call was announced over the radio for all- What I'm saying is they had the tag. Correct. I mean, from the very beginning. Correct. If they thought it was a kidnapping, they had a tag from the very beginning. Yes, Your Honor. They take the time, they go to the IHOP, they interview the witness, and then they go- When he puts it over dispatch to Diaz, Morano says he put him in the back of the car, he yelled at him, he closed the trunk. That's what Diaz knows at the time, right? So I would disagree with the court that these things are happening sequentially. These things are all happening at the same time. Sergeant Diaz is en route while Officer Moran is performing the investigation, which speaks to the speed with which the call and the response is happening. Well, the TELSO obviously does have arrangements to have seats in the rear, but the normal place for children to be seated in a car is not in a trunk. That is correct, and I would also- Maybe occasionally they're in the front seat, but normally in the back seat. But the one place that they are not normally, they're not pushed into the trunk of a car. Correct. That is not where children are normally placed. I would agree, Your Honor, and I would also highlight the fact that the information that was put out with respect to rear-facing seats that were, I guess, appears to be unique to TELSO. This might have been a different case had the children been- Frankly, we all yell at our children sometimes, at least. I think we all do. I mean, children can test your patience. But this would have been a different case, would it not, if the children were being placed in the back seat and they were upset about it and didn't want to be in a car seat or what have you? I would agree with you that we're looking probably at this circumstance somewhat differently. You're looking at a dramatically different case, and the salient fact, one of them, is that they're not being placed in the back seat of a car. They're being put into the trunk, and normally that's not where children are placed in. That's, I mean, it's not the only fact. There are other surrounding facts, as you put it, in the course of a continuous transaction. Correct. But it starts there, does it not? I believe it absolutely starts there, and I think- But doesn't the officer, he himself says- These are my questions. Go ahead and answer his question. I believe, if I remember the question, it was-I'm not forgetting the question. I believe the question was asking, doesn't it begin there with the report of the kidnapping? Yes, and I would echo, I believe it was Judge Niemeyer's comment, that the observations of this witness, what they saw, was so concerning that they actually took affirmative steps to write down the tags and alert the police. They were even still there waiting. They were still present on the scene for the police to interview them, and I think those are all significant facts that only hearken the beginning of the police's investigation. It is not the beginning and the end, and as was also pointed out, we have the entirety of the conversation and the benefit of knowing that Sergeant Diaz purposely turned off his lights and sirens to not alert his approach to the residents for his investigation. Yet there, seemingly doing nothing else, the appellants are standing there not engaged in any other visible activity other than seemingly expecting his arrival. And so every subsequent part of the investigation only furthered the observations of the officer that the appellant did not want to-he wanted to disassociate himself- I found that very curious that they were standing there. Is there anything in the record to suggest that they may have had information about the complaint? In other words, the fact that both the defendant and his wife were standing on the porch sort of as the officers approached is peculiar, isn't it? I agree it's peculiar. I couldn't figure out why they were out there on the porch as the officers approached, and I was just wondering, is there any indication that this information was known to them or broadcast in any way? I see that my time has concluded. May I answer the judge's question? Thank you. I think that in the totality of the circumstances of everything that's happening, Sergeant Diaz, in his experience, as has been articulated in Terry v. Ohio, may certainly factor that in as that they seem to know something. Otherwise, why would they be standing here at this hour of the evening? Oh yeah, the officers found it peculiar too. Yes. I was just wondering whether there was some evidence to suggest why. I understand your question now. Thank you for clarifying. No, there is nothing that would indicate that people would have been alerted through some third source of information because the communications were limited to the radio transmissions were on a police channel as well as just the observations of the IHOP. Can the public have access to the police channels? That information I cannot answer. Okay, thank you. I have an additional question. Yes, I had additional questions. But there's no evidence in the record that they knew anything other than seeing the police pull up in front of their house. I don't actually. It's not in the record that they did see the police pulling up in their house. That's not part of the actual record. But there's no evidence that they heard something over the radio and they were standing outside because there's no evidence of that. I would agree there's no evidence that they would have heard a police radio transmission. I agree with you. And my question earlier. Yes, Your Honor. Regarding the rear seats, the officer dispels it and says, hey, the officer himself volunteers that information. Teslas have rear-facing seats. May I answer that question? Of course you can. Thank you. I do not agree with you that it was dispelled by what Officer Moran said about rear-facing seats. He said that they might have rear-facing seats. It is a possibility that warrants further investigation and certainly consideration by Sergeant Diaz. But that only furthers the reason for the Terry stop to continue. But he acknowledges that Teslas have rear-facing seats. I do not agree with that phrasing, Your Honor. It is might have rear-facing seats. They are not a standard. No, no, no. I'm not saying that he's saying that this one has one. He acknowledges that Teslas have rear-facing seats. Yes. With the understanding that it is a possibility, that it is a design option that can be chosen, yes, I agree with that. And that is something that he puts over dispatch. That is something he puts over dispatch. But as I stated earlier, that is only a fact that warrants further investigation to confirm or dispel as to ascertaining whether or not a kidnapping took place. So the Terry stop is to allay suspicion. Correct. And that is a question that needs answering as part of the investigation. And one more question. Yes, sir. When over to dispatch, what D.I. knows when he goes to the house, right? Yes. Is that there is a Tesla, the tag number, the address. He knows that there are kids that were in the back of a Tesla, yelled at by the parent, and that the trunk was closed in a Tesla that might have rear-facing seats. I would make one qualification to that, Your Honor. And I'm just making sure I pull up the conversation correctly. Your Honor said that the kids were in the back. The specific transmission was open the trunk, yell at the kids, and then close the trunk. So with the qualifier that the back is the trunk, not the back row of seating, then with that qualifier, yes. I guess my point is that's all Diaz knew when he went to the house. That's all Diaz knew before he parked his car, put it in park, yes, but he obviously learns more. So he didn't know anything about somebody being tied up or someone being thrown in the car or pushed in the car. He didn't have that. That's something we learned from Marano at his deposition. Yes, I would agree that at the point that Sergeant Diaz parks his car in the street to get out, he does not know that information. He knows that Officer Moran has spoken to the witness, but he does not know that additional fact that Officer Moran has. I agree with you that that is the state of the record. And for these reasons, we would ask that this court affirm. Thank you. Thank you. You have some rebuttal time. Three points on rebuttal, Your Honors. First, we'd like to discuss everything that officers did not know when they entered Professor Hyatt's home. They did not have a description of the children. They did not have a description of the kidnapper other than that he was a black male. They did not know whether the Tesla from the vague tip was at the home. And they did not know if Professor Hyatt, the person they were speaking to, was at the IHOP that night. Second, none of the cases that defendants rely on stand for the proposition that a Terry stop alone can get officers into the home. They speak about Rivera, but in that case, one, it was not the individual who was stopped's home. It was someone else's home that he entered into. So that implicates different Fourth Amendment principles. Also, the show of authority in that case happened outside of the home, as it did in Harbin. And in Harbin, officers never entered inside of the home, and that was part of the court's reasoning in that case. To say that officers could enter the home based on reasonable suspicion alone would be a sweeping new exigency, and it would undermine the probable cause required for a warrant because then officers could approach someone on their porch, elicit just enough information to amount to reasonable articulable suspicion, initiate a Terry stop, and then use Terry as a Trojan horse to enter the home. I believe in the reasonable suspicion, the officer judges it to be confirmatory, the discussion or the confrontation or whatever it was at the home. I mean, it's not just reasonable suspicion and they go into a home. It's a reasonable suspicion plus an investigation plus a conversation, which the officer judged at least somewhat to be confirmatory. Isn't that what we have here? Judge, so there are disputed facts that go into the reasonable suspicion analysis in this case. Whether Professor Hyatt drove a black Tesla, whether a black Tesla was on the premises, and whether Professor Hyatt's behavior could be characterized as evasive and suspicious when the video shows him behaving respectfully and a police expert testified in this case that an objective officer. You keep talking about disputed facts, and disputed facts are when an officer gets two different stories and has to make a determination. But from the very beginning, this was an emergency announcement of kidnapping. The officers, an officer on a highway 10 miles away could hear it and is entitled to respond to that dispatch, say that's an emergency. So we start off with the notion that we have an emergency dispatch announcing a kidnapping, and then we have these pieces being put into place. But the evidence is what the officers learned as they're going along. It's not whether in fact it was so. As we know, what Duran learned, we know what he learned, and that's not been disputed. We know what Diaz knew, and that's not disputed. And we knew they walked up and we have the tape of the encounter on the porch. I've watched that a couple times. I don't think we have a battle of any kind of facts. What we have is a sufficiency of a suspicion, number one. And number two, whether an investigation in Terry's stop on the porch can be pursued when the person retreats into the home during the course of the investigation. And that probably is an interesting question. And you say the officers have to stop and go get a warrant. And, of course, the impracticality of that is that the whole crime could have been committed and the whole purpose of a Terry's stop defeated. But I understand your argument, but I don't know if you can draw fine lines and say they can deduct a Terry's stop. But when the person during the course of the Terry's stop and investigation retreats into the house, the officers are now without any power. Your Honor, two points in response to that. It seems that there is a bit of a mashing of doctrines. So there's the emergency aid doctrine, which says that officers need an objectively reasonable basis to render emergency aid. Well, we don't know it's emergency aid, and they don't hide behind emergency aid. They basically have a suspicion. And they're trying to investigate and make sure we don't have a serious crime, a very serious crime. And so they are taking reasonable steps to decide whether there's a serious crime. And as they go through that process, their suspicion is not allayed. It's enhanced. We have one affirmative statement made by the defendant. There's no kidnapping here. And the rest he wouldn't answer. And so as a consequence, I mean, he could have simply said, oh, officers, there must be a misunderstanding. Those were my kids. Yes, I put them in there. I have rear seats and this type of thing. But he didn't do any of that. He enhanced it, and he shut his wife up. So I understand your legal arguments where you're parsing the times under different doctrines. But we have a basic concept here of public privacy, which we have to honor, and the public need to investigate a crime on which the officers are investigating. And if we apply your doctrine, we're basically telling the officers they have to quit at this point. And that could have been the most serious crime. And can you imagine the uproar if there was an actual crime there? They had retreated into the house. The defendant said, there's no kidnapping here, closed the door, ran into the house, and the officers walked away. What kind of response would we get? Judge, I see my time has concluded. May I respond? We are not asking for this court to establish a new rule. The Supreme Court has already struck the balance. We're asking you to follow clearly established Supreme Court precedent. And after Payton, it is that officers need probable cause plus exigent circumstances to enter the home. And ultimately, the Supreme Court has been clear that it's done printing new permission slips to allow officers to enter the home absent a warrant. Accepting defendants' arguments would require this court to do just that. For these reasons, if your honors have no further questions, we respectfully request that you reverse and remand. All right. We thank you both for your arguments. And as student counsel, you've acquitted yourself very capably, and the court appreciates it. We'd like to come down and greet counsel and then proceed to her last case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, DeAndrea Gist Benjamin